## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANDREW DURHAM, | Civil Action No.: 3:21-pq-<br>Related to MDL No. 3004 |
| Plaintiff, | |
| v. | COMPLAINT FOR DAMAGES |
| SYNGENTA AG; SYNGENTA CROP<br>PROTECTION, LLC; CHEVRON U.S.A.,<br>INC.; and DOES 1 through 60 inclusive, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff ANDREW DURHAM, by and through counsel, alleges upon information and belief and complains of Defendants Syngenta AG ("SAG") and Syngenta Crop Protection, LLC ("SCPLLC") (together with their predecessors-in-interest, referred to collectively as the "Syngenta Defendants"); Chevron U.S.A., Inc. (together with its predecessors- in-interest, referred to collectively as the "Chevron Defendants"); and Does One through Sixty, states:

### STATEMENT OF THE CASE

1.    Plaintiff ANDREW DURHAM suffers from Parkinson's disease caused by his exposure to the herbicide Paraquat.

2.    Plaintiff ANDREW DURHAM is a resident of Beaumont, Texas.

3.    Defendants are companies that since the 1960s have manufactured, distributed, licensed, marketed, and sold Paraquat for use in the United States, including Texas and California.

4.    Plaintiff ANDREW DURHAM brings this action to recover damages for personal injuries resulting from his exposure to Paraquat that was manufactured, distributed, and

sold by Defendants.

5.     Defendants' tortious conduct, including their negligent acts and omissions in the research, testing, design, manufacture, marketing, and sale of Paraquat, caused Plaintiff ANDREW DURHAM's injuries. At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that Paraquat was a highly toxic substance that can cause severe neurological injuries and impairment, and should have taken steps in their research, manufacture, and sale of Paraquat to ensure that people would not be harmed by foreseeable uses of Paraquat.

## **JURISDICTION**

6.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and each Defendant. Indeed, Plaintiff is a resident of Texas; SCPLLC is a Delaware limited liability company with its principal place of business in Greensboro, North Carolina (SCPLLC is a wholly-owned subsidiary of Defendant SAG); SAG is a foreign corporation with its principal place of business in Basel, Switzerland; Chevron U.S.A., Inc. is a Pennsylvania corporation with its principal place of business in San Ramon in Contra Costa County, California. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiff resides.

7.      The amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost.

## **VENUE**

8.     Venue is proper in the Southern District of Illinois pursuant to Case Management Order No. 1 of MDL No. 3004, *In re: Paraquat Products Liability Litigation*, allowing cases that would be subject to transfer to the MDL to be filed directly in the Southern District of Illinois. *In*

*re: Paraquat Products Liability Litigation*, 3:21-md-03004-NJR ECF #16. This complaint alleges injury due to Paraquat, is subject to jurisdiction of the federal courts due to the diversity of the parties, and is subject to transfer pursuant to 28 U.S.C. § 1407 and the transfer order of the Judicial Panel on Multidistrict Litigation. *In re: Paraquat Products Liability Litigation*, --- F. Supp. 3d ---, 2021 WL 2369295 (J.P.M.L. June 7, 2021).

9.     If not for MDL 3004 Case Management Order No. 1, venue is proper within the Northern District of California pursuant to 28 U.S.C. § 1391 because Defendants conduct business there and are subject to personal jurisdiction in that District. Defendants sell, market, and/or distribute Paraquat within the Northern District of California. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within that District. Chevron U.S.A., Inc. is a corporation organized under the laws of the State of Pennsylvania, with its headquarters and principal place of business in San Ramon in Contra Costa County, California.

10.     The United States District Court for the Northern District of California also has personal jurisdiction over each of the Defendants in this diversity case because a state court of California would have such jurisdiction, in that:

a.     Over a period of two (Chevron Defendants) to six (Syngenta Defendants) decades, each Defendant and/or its predecessor(s), together with those with whom they were acting in concert, manufactured Paraquat for use as an active ingredient in Paraquat products, distributed Paraquat to formulators of Paraquat products, formulated Paraquat products, marketed Paraquat products to the California agricultural community, and/or distributed Paraquat products, intending that such products would be regularly, and knowing they regularly were, sold and used in the State of California;

b.     Plaintiff's claims against each Defendant arise out of these contacts between

the Defendant and/or its predecessor(s), together with those with whom they were acting in concert, with the State of California; and

c.      These contacts between each Defendant and/or its predecessors, together with those with whom they were acting in concert, and the State of California, were so regular, frequent, and sustained as to provide fair warning that it might be hauled into court there, such that requiring it to defend this action in the State of California does not offend traditional notions of fair play and substantial justice.

## INTRADISTRICT ASSIGNMENT

11.     This action arises from the actions of Defendants – and, in particular, the actions of Defendant Chevron U.S.A., a Pennsylvania corporation with its principal place of business in San Ramon in Contra Costa County, California. If not for MDL 3004 Case Management Order No. 1, this claim may be assigned to either the San Francisco Division or the Oakland Division pursuant to Local Rule 3-2(c).

## PARTIES

12.     The true names or capacities whether individual, corporate, governmental or associate, of the defendants named herein as Doe are unknown to Plaintiff who therefore sues said defendants by such fictitious names. Plaintiff prays for leave to amend this Complaint to show their true names and capacities and/or bases for liability when the same have been finally determined.

13.     Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Defendants designated herein as Doe is strictly, negligently, or otherwise legally responsible in some manner for the events and happenings herein referred to, and negligently or otherwise caused injury and damages proximately to Plaintiff as is hereinafter alleged.

14. At all times herein mentioned, each and every one of the Defendants was the agent, servant, employee, joint venturer, alter ego, successor-in-interest, and predecessor-in-interest of each of the other, and each was acting within the course and scope of their agency, service, joint venture, alter ego relationship, employment, and corporate interrelationship.

15. U.K. manufacturer Imperial Chemical Industries Ltd. a/k/a Imperial Chemical Industries PLC ("ICI") first introduced Paraquat to world markets in or about 1962 under the brand name GRAMOXONE®.

16. In or about 1971, ICI created or acquired a wholly-owned U.S. subsidiary organized under the laws of the State of Delaware, which was ultimately known as ICI Americas Inc. ("ICI Americas").

17. Chevron Chemical Company was a corporation organized under the laws of the State of Delaware.

18. Pursuant to distribution and licensing agreements with ICI and ICI Americas, Chevron Chemical Company had exclusive rights to distribute and sell Paraquat in the United States and did in fact manufacture, formulate, distribute, and sell Paraquat in the United States, including in California for use in California and in Texas for use in Texas, from approximately 1964 to 1986.

19. Chevron U.S.A., Inc. is the successor-in-interest to Chevron Chemical Company.

20. At all relevant times, Chevron Chemical Company acted as the agent of Chevron U.S.A., Inc. in selling and distributing Paraquat in the U.S. At all relevant times, Chevron Chemical Company was acting within the scope of its agency in selling and distributing Paraquat. Chevron U.S.A., Inc. is liable for the acts of its agent.

21. From approximately 1964 through 1986, pursuant to distribution and licensing

agreements with Chevron Chemical Company, SAG's and/or SCPLLC's predecessors-in-interest, ICI and ICI Americas, and Does One through Sixty manufactured some or all of the Paraquat that Chevron Chemical Company distributed and sold in the United States, including in California for use in California and in Texas for use in Texas.

22.     From approximately 1964 through  1986, pursuant to distribution and licensing agreements between and among them, ICI, ICI Americas, Chevron Chemical Company, and Does One through Sixty acted in concert to register, manufacture, formulate, and distribute and sell (through Chevron Chemical Company) Paraquat for use in the U.S., including in California for use in California and in Texas for use in Texas, and their respective successors-in-interest, SAG, SCPLLC, and Chevron U.S.A., Inc., are jointly liable for the resulting injuries alleged herein.

23.     After 1986, SCPLLC, Does One through Sixty, and/or their predecessors-in-interest sold and distributed and continue to sell and distribute Paraquat in the United States, including in California for use in California and in Texas for use in Texas.

24.     As a result of mergers and corporate restructuring, SAG is the successor-in-interest to ICI.

25.     As a result of mergers and corporate restructuring, SCPLLC is the successor-in-interest to ICI Americas, Inc.

26.     Thus, from approximately 1964 through the present, the Syngenta Defendants, Does One through Sixty, or their predecessors-in-interest have manufactured, formulated, distributed, and sold Paraquat for use in the U.S., including in California for use in California and in Texas for use in Texas.

## **PLAINTIFF ANDREW DURHAM'S EXPOSURE TO PARAQUAT**

27.     At all relevant times, Plaintiff  ANDREW DURHAM  was an operator at Goodyear who was exposed to Paraquat from 1969 to 1971 in Texas.

28.     At  all  relevant  times,  Plaintiff  ANDREW DURHAM  was exposed to Paraquat:

(1) when it was mixed, loaded, applied, and/or cleaned; (2) as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind); and/or (3) as a result of contact with sprayed plants.

29.    At all relevant times, it was reasonably foreseeable that when Paraquat was used in the intended or a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to it.

30.    At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body: (1) through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage were present); (2) through the olfactory bulb; (3) through respiration into the lungs; and (4) through ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

## PARAQUAT CAUSES PARKINSON'S DISEASE

31.    At all relevant times, it was reasonably foreseeable that Paraquat that entered a human body could ultimately enter the brain.

32.    At all relevant times, it was reasonably foreseeable that Paraquat that entered a human body could induce the misfolding of the alpha synuclein protein.

33.    Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system–the part of the central nervous system that controls movement.

34.    The characteristic symptoms of Parkinson's disease are its "primary" motor

symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

35.     Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

36.     Non-motor symptoms—such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression—are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

37.     There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression; and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective and tend to increasingly cause unwelcome side effects the longer they are used.

38.      One of the primary pathophysiological hallmarks of Parkinson's disease is the selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc").

39.     Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

40.      The death of dopaminergic neurons in the SNpc decreases the production of dopamine. Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control

of motor function, resulting in the motor symptoms of Parkinson's disease.

41.    The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

42.    Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

43.    Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of the disease.

44.    Paraquat is highly toxic to both plants and animals, creating oxidative stress that causes or contributes to cause the degeneration and death of plant or animal cells.

45.    Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

46.    The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life—with photosynthesis in plant cells, and with cellular respiration in animal cells. The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells. Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically

present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

47.    Paraquat's redox properties have been known to science since at least the 1930s.

48.    It has been scientifically known since the 1960s that Paraquat (due to its redox properties) is toxic to the cells of plants and animals. The same redox properties that make Paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons in humans– that is, Paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons in the human brain by creating oxidative stress through redox cycling.

49.    Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's disease, i.e., use in a laboratory to artificially produce the symptoms of Parkinson's disease in animals.

50.    Animal studies involving various routes of exposure have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's disease.

51.    Hundreds of in vitro studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

52.    Epidemiological studies have found that exposure to Paraquat significantly increases the risk of contracting Parkinson's disease. A number of studies have found that the risk of Parkinson's disease is more than double in populations with occupational exposure to Paraquat

compared to populations without such exposure.

53.     These convergent lines of evidence (toxicology, animal experiments, and epidemiology) demonstrate that Paraquat exposure generally can cause Parkinson's disease.

## PARAQUAT REGULATION

54.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the U.S., requires that pesticides be registered with the U.S. Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

55.     The California Food & Agric. Code § D. 7, Ch. 2, which regulates the labeling, distribution, use, and application of pesticides within the State of California, requires that pesticides be registered with the California Department of Pesticide Regulation ("CDPR") before they are offered for sale in the State of California. Cal. Food & Agric. Code § 12811.

56.     Paraquat is a "restricted use pesticide" under federal law, *see* 40 C.F.R. § 152.175, which means it is "limited to use by or under the direct supervision of a certified applicator," and it cannot be sold, used, or possessed by any person in Texas without the proper licensing and permitting.  Additionally, Paraquat is a "restricted material" under California law, *see* Cal. Code Regs. tit. 3, § 6400(e), which means it cannot be sold, used, or possessed by any person in California without the proper licensing and permitting.

57.     As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

58.     As a general rule, FIFRA requires registrants, the chemical companies registered to sell the pesticides, to perform health and safety testing of pesticides. However, FIFRA does not

require the EPA itself to perform health and safety testing of pesticides, and the EPA generally does not perform such testing.

59.     The EPA registers (or re-registers) a pesticide if it is persuaded, based largely on studies and data submitted by the registrant, that: (1) its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A); (2) its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B); (3) it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and (4) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

60.     FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

61.     Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2). However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

62.     The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person ... any pesticide which is ... misbranded." 7 U.S.C. § 136j(a)(1)(E). A pesticide is misbranded under FIFRA if, among other things: (1) its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any

particular, 7 U.S.C. § 136(q)(1)(A); (2) the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or (3) the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

63.    As a result, a pesticide may be misbranded despite an EPA determination that it met FIFRA's registration criteria. In other words, notwithstanding its registration, a pesticide is misbranded if its label contains "false or misleading" statements, has inadequate instructions for use, or omits warnings or cautionary statements necessary to protect human health. Similarly, a pesticide may be found to cause unreasonable adverse effects on humans when used according to the approved label despite a determination by the EPA that it would not.

64.    Plaintiff does not seek in this action to impose any labeling or packaging requirement in addition to or different from those required under FIFRA on Defendants. Any allegation in this Complaint that a Defendant breached a duty to provide adequate directions for the use of or warnings about Paraquat, breached a duty to provide adequate packaging for Paraquat, concealed, suppressed, or omitted to disclose any material fact about Paraquat, or engaged in any unfair or deceptive practice regarding Paraquat, is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice having rendered the Paraquat "misbranded" under FIFRA. However, Plaintiff brings claims and seeks relief in this action only under state law, and do not bring any claims or seek any relief in this action under FIFRA.

**Acts of Syngenta Defendants**

65.     SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland. It is a successor by merger or continuation of business to its corporate predecessors, including but not limited to ICI.

66.     SCPLLC is a limited liability company organized under the laws of the State of Delaware. It is a successor by merger or continuation of business to its corporate predecessors, including but not limited to ICI Americas. SCPLLC is registered with the State of California and the State of Texas through their respective Secretaries of States to do business in the State of California and the State of Texas.

67.     SCPLLC or its corporate predecessors have sufficient minimum contacts with the State of California and State of Texas and have purposefully availed themselves of the privileges of conducting business in the State of California and State of Texas, in that they:

        a.     secured and maintained the registration of Paraquat products and other pesticides with the CDPR to enable themselves and others to manufacture, distribute, sell, and use these products in the State of California and State of Texas;

        b.     marketed, licensed, advertised, distributed, sold, and delivered Paraquat and other pesticides to chemical companies, licensees, distributors, and dealers whom they expected to distribute and sell Paraquat and other pesticides in or for use in the State of California and State of Texas, including the Chevron Defendants and "Syngenta Retailers," as well as to applicators and farmers in the State of California and State of Texas;

        c.     employed or utilized sales representatives to market and sell Paraquat and other pesticides in California and State of Texas;

     d.     maintained several locations throughout the State of California, including in the towns of Sanger, Granite Bay and Roseville;

     e.     attended meetings of the CDPR's Pesticide Registration and Evaluation Committee relating to the registration of their pesticides, including Paraquat;

     f.     sponsored continuing education seminars for the CDPR at various locations in the State of California, including the towns of Oxnard, Seal Beach, Rancho Santa Fe, Somis, Orcutt, Woodland and Pala;

     g.     utilized California state courts to promote their pesticide business, including filing an action against the CDPR and another pesticide manufacturer for allegedly using Syngenta data to obtain approval of pesticides for others without its consent, *see Syngenta Crop Prot., Inc. v. Helliker* (2006) 138 Cal.App.4th 1135; and filing an action against the California EPA's Office of Environmental Health Hazard Assessment challenging the agency's decision to list its pesticide atrazine as a chemical known to cause reproductive toxicity under Proposition 65, *see Syngenta Crop Protection v. OEHHA* (Sacramento Superior Court Case No. 34-2014-800001868); and

     h.     performed and funded the testing of pesticides in the State of California.

68.    SCPLLC's contacts with the State of California and State of Texas are related to or gave rise to this controversy.

69.    SAG exercises an unusually high degree of control over SCPLLC, such that SCPLLC is the agent or mere instrumentality of SAG. SCPLLC's contacts with California and Texas are thus imputed to SAG for purposes of jurisdiction. See *City of Greenville, Ill. v. Syngenta Crop Prot*., Inc., 830 F. Supp. 2d 550 (S.D. Ill. 2011).

## **Acts of Chevron Defendants**

70.     Chevron U.S.A., Inc. is a corporation organized under the laws of the State of Pennsylvania, with its headquarters and principal place of business in San Ramon, California.

71.     Does One through Sixty are corporate entities which are agents, joint venturers, alter-egos, successors-in-interest, and predecessors-in-interest to Chevron U.S.A., Inc. Does One through Sixty were each acting within the course and scope of their agency, joint venture, alter-ego relationship, and corporate interrelationship. The exact nature, relation, and corporate structure of Does One through Sixty have not yet been finally determined. Plaintiff reserves the right to amend this complaint with corporate allegations when they are finally determined.

72.     Jurisdiction is proper over Chevron U.S.A., Inc. because it is a California resident, maintaining its principal place of business and headquarters in California.

### DEFENDANTS' TORTIOUS CONDUCT RESULTED IN PLAINTIFF ANDREW DURHAM DEVELOPING PARKINSON'S DISEASE

73.     Plaintiff ANDREW DURHAM hereby refers to, incorporates, and re-alleges by this reference as though set forth in full, each and every allegation hereinabove and makes them a part of the following allegations.

74.     Plaintiff ANDREW DURHAM is a resident of Beaumont, Texas.

75.     Plaintiff ANDREW DURHAM was exposed to Paraquat manufactured and sold by Defendants.

76.     Plaintiff ANDREW DURHAM was an operator at Goodyear in Beaumont, Texas who was exposed to Paraquat from 1969 to 1971.

77.     During this time, Plaintiff ANDREW DURHAM was in close contact to the Paraquat that was designed, manufactured, and distributed by Defendants, and each of them.

78.    Plaintiff ANDREW DURHAM had never received any training in preparing Paraquat for application or in applying Paraquat.

79.    The Paraquat to which Plaintiff ANDREW DURHAM was exposed entered his body (1) through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage are present); and/or (2) through the olfactory bulb; and/or (3) through respiration into the lungs; and/or (4) through ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways. Once absorbed, the Paraquat entered his bloodstream, attacked his nervous system, and was a substantial factor in causing him to suffer Parkinson's disease.

80.    Plaintiff ANDREW DURHAM was diagnosed with Parkinson's disease on or about 2021.

81.    Plaintiff ANDREW DURHAM had no reason to suspect the diagnosis was connected to his past Paraquat exposure.

82.    Plaintiff ANDREW DURHAM was never told, either by a medical professional, by media, or by the Defendants, that chronic, low-dose exposure to Paraquat could cause him to suffer Parkinson's disease.

83.    When Plaintiff ANDREW DURHAM was exposed to paraquat, he neither knew nor could have expected that wearing gloves, a mask, or other personal protective equipment or taking any other precautions might have prevented or reduced the risk of a neurological injury or neurodegenerative disease caused by exposure to Paraquat.

84.    Plaintiff ANDREW DURHAM first became aware of Paraquat's role in

causing his Parkinson's disease and the wrongful acts of the Defendants that caused or contributed to his developing Parkinson's disease within a year of the filing date of this Complaint.

85.    Plaintiff ANDREW DURHAM did not discover this earlier because he had no reason to suspect that him working with Paraquat could cause him to suffer Parkinson's disease.

86.    Defendants' acts and omissions were a legal, proximate, and substantial factor in causing Plaintiff ANDREW DURHAM to suffer severe and permanent physical injuries, pain, mental anguish, and disability, and will continue to do so for the remainder of his life.

87.    By reason of the premises, it became necessary for Plaintiff ANDREW DURHAM to incur expenses from medical care and treatment, and related costs and expenses required in the care and treatment of said injuries. Plaintiff ANDREW DURHAM's damages in this respect are presently unascertained as said services are still continuing.

88.    By reason of the premises, it will be necessary for Plaintiff ANDREW DURHAM to incur future expenses for medical care and treatment, and related costs and expenses required for future care and treatment. Plaintiff's damages in this respect are presently unascertained as said services are still continuing. Plaintiff prays leave to insert elements of damages in this respect when the same are finally determined.

89.    By reason of the premises, Plaintiff ANDREW DURHAM has been unable to continue Plaintiff's regular employment, incurring special damages in a presently unascertained sum as said loss is still continuing. Plaintiff prays leave to insert elements of damages regarding past wage loss, future wage loss, and lost earning capacity when the same are finally determined.

90.    By reason of the premises, Plaintiff has suffered general (non-economic) damages in a sum in excess of the jurisdictional minimum of this Court.

91.    By reason of the premises, Plaintiff has suffered special (economic) damages in a

sum in excess of the jurisdictional minimum of this Court.

## CAUSES OF ACTION

### COUNT I
### STRICT PRODUCTS LIABILITY DESIGN DEFECT

92.     Plaintiff ANDREW DURHAM incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

93.     Defendants are liable to Plaintiff ANDREW DURHAM under a products liability theory for marketing a defectively-designed product, as well as for failing to adequately warn of the risk of severe neurological injury caused by chronic, low-dose exposure to Paraquat.

94.     At all relevant times, Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold Paraquat for use in the State of California and State of Texas.

95.      At all relevant times and places, the Paraquat that Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold was used in the intended or a reasonably foreseeable manner.

96.     Plaintiff ANDREW DURHAM was exposed to Paraquat that Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold. As a result of that exposure, Paraquat entered Plaintiff ANDREW DURHAM's body causing Plaintiff to develop Parkinson's disease.

97.     The Paraquat that Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold did not perform as safely as an ordinary consumer would have expected it to perform when used in the intended or a reasonably foreseeable manner, in that:

            a.      as designed, manufactured, formulated and packaged Paraquat was likely to

be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed (or areas near where it had been sprayed); and

b.       when inhaled, ingested, or absorbed into the body, it was likely to cause neurological damage that was both permanent and cumulative, and repeated low-dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

98.    Alternatively, Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors' Paraquat products were defectively designed in that the risk of danger inherent in the challenged design outweighed the benefits of such design, considering, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

99.    The design defect existed when the Paraquat left Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors' possession and control.

WHEREFORE, Plaintiff ANDREW DURHAM respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff ANDREW DURHAM demands a jury trial on all issues contained herein.

## COUNT II
## STRICT PRODUCTS LIABILITY FAILURE TO WARN

100.    Plaintiff ANDREW DURHAM incorporates by reference each allegation set

forth in preceding paragraphs as if fully stated herein.

101.    Defendants are also liable to Plaintiff ANDREW DURHAM under a products liability theory based on their failure to adequately warn of the risks of Paraquat.

102.    When Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors manufactured and sold the Paraquat to which Plaintiff was exposed, it was known or knowable to Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors in light of scientific knowledge that was generally accepted in the scientific community that:

      a.    Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

      b.    when inhaled, ingested, or absorbed into the body, it was likely cause latent neurological damage that was both permanent and cumulative, and that repeated, low-dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

103.    The risk of contracting Parkinson's disease from chronic, low-dose exposure to Paraquat presented a substantial danger to users of Paraquat when the product was used in a reasonably foreseeable manner.

104.    An ordinary consumer would not have recognized the potential risk of permanent, irreversible neurological damage, including the risk of contracting Parkinson's disease, from chronic, low-dose exposure to Paraquat.

105.    Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors failed to warn of the potential risk of permanent, irreversible neurological

damage from chronic, low-dose exposure to Paraquat, and failed to provide adequate instructions regarding avoidance of these risks.

106.    As a direct and proximate result of Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors' marketing of a defective product, Plaintiff ANDREW DURHAM suffered the injuries described in this Complaint.

WHEREFORE, Plaintiff ANDREW DURHAM respectfully requests that this Court enter judgment in Plaintiff ANDREW DURHAM's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff ANDREW DURHAM demands a jury trial on all issues contained herein.

## COUNT III
## NEGLIGENCE

107.    Plaintiff ANDREW DURHAM incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

108.    At all relevant times, Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold Paraquat for use in the State of California and State of Texas.

109.    Plaintiff ANDREW DURHAM was exposed to Paraquat in the State of Texas that Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors manufactured and sold.

110.    The Paraquat to which Plaintiff ANDREW DURHAM was exposed was used in the intended or a reasonably foreseeable manner.

111.    At all times relevant to this claim, in researching, designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, Chevron U.S.A., Inc., the Syngenta

Defendants, Does One through Sixty, and their corporate predecessors owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to Paraquat, including Plaintiff ANDREW DURHAM.

112.    When Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, packaged, labeled, distributed, and sold the Paraquat to which Plaintiff ANDREW DURHAM was exposed, it was reasonably foreseeable that Paraquat:

      a.    was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

      b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it has been sprayed or areas near where it has been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

113.    In breach of the aforementioned duty to Plaintiff, Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors negligently:

      a.    failed to design, manufacture, formulate, and package Paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

      b.    designed, manufactured, and formulated Paraquat such that it was likely to cause neurological damage that was both permanent and cumulative, and repeated

exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease;

c.      failed to conduct adequate research and testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d.      failed to conduct adequate research and testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.      failed to conduct adequate research and testing to determine the extent to which Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease;

f.      failed to direct that Paraquat be used in a manner that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

g.      failed to warn that Paraquat was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

114.    Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors knew or should have known that users would not realize the dangers of exposure to Paraquat and negligently failed to take reasonable steps to prevent the foreseeable risk of harm from exposure to Paraquat.

115.    As a direct and proximate result of Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors' negligence, Plaintiff ANDREW DURHAM suffered the injuries described in this Complaint.

116.    Additionally, in the course of designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors violated laws, statutes, and regulations, including but not limited to: sections of Food & Agriculture Code, Division 7, Chapter 2 (Pesticides), sections of Title 3, California Code of Regulations, Division 6 (Pesticides), and Chapter 1951, Texas Structural Pest Control Act, of the Texas Occupations Code.

117.    Plaintiff ANDREW DURHAM was a member of the class of persons that said laws, statutes, and regulations were intended to protect.

118.    Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors' violations of said laws, statutes, and regulations were also substantial factors in causing Plaintiff ANDREW DURHAM's injuries.

119.    The injuries that resulted from Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors' violations were the kind of occurrence the laws, statutes, and regulations were designed to prevent.

WHEREFORE, Plaintiff ANDREW DURHAM respectfully requests that this Court enter judgment in Plaintiff ANDREW DURHAM's favor for compensatory and punitive

damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff ANDREW DURHAM demands a jury trial on all issues contained herein.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

120.    Plaintiff ANDREW DURHAM incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

121.    At all relevant times, Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors engaged in the business of designing, manufacturing, distributing, and selling Paraquat and other restricted-use pesticides and held themselves out as having special knowledge or skill regarding Paraquat and other restricted-use pesticides.

122.    At all relevant times, Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold Paraquat for use in the State of California and State of Texas.

123.    Plaintiff ANDREW DURHAM was exposed to Paraquat in the State of Texas that Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold.

124.    The Paraquat to which Plaintiff ANDREW DURHAM was exposed was not fit for the ordinary purposes for which it was used, and in particular:

a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

      b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

125.    As a direct and proximate result of Chevron U.S.A., Inc., the Syngenta Defendants, Does One through Sixty, and their corporate predecessors' breach of implied warranty, Plaintiff ANDREW DURHAM suffered the injuries herein described.

WHEREFORE, Plaintiff ANDREW DURHAM respectfully requests that this Court enter judgment in Plaintiff ANDREW DURHAM's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff ANDREW DURHAM demands a jury trial on all issues contained herein.

## COUNT V PUNITIVE DAMAGES

126.    Plaintiff ANDREW DURHAM incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

127.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of Paraquat. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion of Paraquat to mislead farmers and consumers.

128.    This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that Paraquat did not cause Parkinson's Disease, and that full disclosure of the true risks of Paraquat would limit the amount of money Defendants would make selling Paraquat in California and Texas.

Defendants' objective was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this Complaint. Plaintiff was denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff ANDREW DURHAM's rights.

129.    There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiff ANDREW DURHAM requests punitive damages against the Defendants for the harms caused to Plaintiff.

WHEREFORE, Plaintiff ANDREW DURHAM respectfully requests that this Court enter judgment in Plaintiff ANDREW DURHAM's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff ANDREW DURHAM demands a jury trial on all issues contained herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests this Court to enter judgment in Plaintiff's favor and against the Defendants for:

a.    actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.    exemplary and punitive damages sufficient to punish and deter the Defendants and others from future fraudulent practices;

c.    pre-judgment and post-judgment interest;

   d.  costs including reasonable attorneys' fees, court costs, and other litigation

expenses; and

   e.  any other relief the Court may deem just and proper.


Dated: October 29, 2024    Respectfully submitted,

           **BAILEY COWAN HECKAMAN PLLC**


           */s/Aaron M. Heckaman*
           Aaron M. Heckaman, TX. Bar No. 24059920
           *Pro Hac Forthcoming*
           1360 Post Oak Blvd., Suite 2300
           Houston, TX 77056
           Phone: (713) 425-7100
           Facsimile: (713) 425-7101
           Email: paraquat@bchlaw.com

           ATTORNEYS FOR PLAINTIFF

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all of the triable issues within this pleading.

Dated: October 29, 2024                    Respectfully submitted,

                                           **BAILEY COWAN HECKAMAN PLLC**


                                           */s/Aaron M. Heckaman*
                                           Aaron M. Heckaman, TX. Bar No. 24059920
                                           *Pro Hac Forthcoming*
                                           1360 Post Oak Blvd., Suite 2300
                                           Houston, TX 77056
                                           Phone: (713) 425-7100
                                           Facsimile: (713) 425-7101
                                           Email: paraquat@bchlaw.com

                                           ATTORNEYS FOR PLAINTIFF